IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DONNA ABRAMS**                                Case No. 4:18 CV 637
**ON BEHALF OF Z.A.,**

    Plaintiff,                               Judge John R. Adams

    v.                                      Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                               REPORT AND RECOMMENDATION


### INTRODUCTION

Donna Abrams ("Abrams") filed a Complaint against the Commissioner of Social Security

("Commissioner") on behalf of her son, "Z.A" ("Plaintiff"), seeking judicial review of the

Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district

court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the

undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-

document entry dated March 20, 2018). Following review, and for the reasons stated below, the

undersigned recommends the decision of the Commissioner be affirmed**.**


### PROCEDURAL BACKGROUND

Abrams filed an application for SSI on behalf of Plaintiff in January 2014, alleging a

disability onset date of November 1, 2013. (Tr. 203-06). His claims were denied initially and upon

reconsideration. (Tr. 92-94, 98-100). Abrams then requested a hearing before an administrative

law judge ("ALJ"). (Tr. 105-07). On March 15, 2017, Abrams and Plaintiff (represented by

counsel), appeared and testified at a hearing before the ALJ. (Tr. 41-60). On May 16, 2017, the

ALJ found Plaintiff not disabled in a written decision. (Tr.10-24). The Appeals Council denied

Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3); *see* 20 C.F.R. §§ 416.1455, 416.1481. Abrams timely filed the instant action on March 20, 2018. (Doc. 1).

**FACTUAL BACKGROUND**

Personal Background and Testimony

Plaintiff was born in June 2009, making him four years old on the date of his disability application and on his alleged onset date, and seven years old at the ALJ hearing. *See* Tr. 203. Both Plaintiff and Abrams testified at the March 2017 hearing before the ALJ. *See* Tr. 45- 60.

Plaintiff was in the first grade (Tr. 45) and enjoyed school "a lot" (Tr. 46). He "sometimes" got in trouble at school because he talked when he was not supposed to, though he "tr[ied] not to". *Id*. Plaintiff had one brother with whom he got along "pretty good". *Id*.

Plaintiff took medication, which sometimes made him feel "different". (Tr. 47). Plaintiff testified he attended speech therapy twice each week, and sometimes had a therapist visit him at home. (Tr. 47-48). Plaintiff enjoyed playing games with Haley (a home therapist). (Tr. 48). In his spare time, Plaintiff enjoyed playing video games, watching television, and playing with his toys. *Id*. He participated in household chores such as sweeping and mopping. (Tr. 48-49). Plaintiff told the ALJ of an incident where he spilled icing on the floor and mopped it up without his mother having to tell him to do so. *Id*.

Abrams testified that Plaintiff and his brother did not always get along, but they had a good relationship. (Tr. 50). She noted Plaintiff was sometimes physically aggressive with his brother. *Id*. Plaintiff had nightmares and got in his mother's bed in the middle of the night two to three times per week. (Tr. 51).

Abrams noted Plaintiff attended counseling twice per month outside the home. (Tr. 52). She detailed difficulties finding the right type and dose of medication for Plaintiff. (Tr. 52-53). At school, Plaintiff was in a "normal" classroom, but had an Individualized Education Program ("IEP"), and attended speech and occupational therapy. (Tr. 53). Plaintiff had "good" grades after a medication adjustment. (Tr. 54). Teachers reported to Abrams that Plaintiff listened "for the most part", but sometimes required "redirection". *Id*. Abrams described Plaintiff as "helpful" at home, but it was often difficult to get him to listen. (Tr. 55). He had an "attitude . . . or an issue with something every day". (Tr. 59). Abrams stated Plaintiff had tantrums lasting "twenty minutes or so". *Id*. Plaintiff did not have these problems at school. *Id*.

Medical Records

In August 2013, Plaintiff and Abrams attended an intake assessment at the Columbiana County Mental Health Clinic. (Tr. 628-39). Abrams reported Plaintiff was "very hyper" and "constantly screaming". (Tr. 628). She stated Plaintiff recently "body slammed" another child and sometimes hit himself and his parents. *Id*. Plaintiff was four years old at the time of the evaluation, and Abrams reported these symptoms were present since birth. *Id*. On examination, providers found Plaintiff appropriately dressed, with good hygiene, grooming, and posture. (Tr. 632). He was cooperative, had a labile affect, but had "darting" eye contact, poor emotional insight and social judgment, and slurred speech. *Id*. Plaintiff seemed restless and had "fluctuating" attention. *Id*. Providers diagnosed disruptive behavior disorder, sibling relational problems, and a learning disorder, not otherwise specified. (Tr. 639).

Plaintiff attended an initial psychiatric evaluation at the Columbiana Clinic with psychiatrist Christopher Seman in September 2013. (Tr. 607-08). Abrams's concerns were improving Plaintiff's behavior and reducing aggression. (Tr. 607). She reported Plaintiff often

3

slapped others and screamed loudly. *Id*. She rated the severity of his problems as "moderate". *Id*. On examination, Dr. Seman found Plaintiff alert and calm with delayed speech. *Id*. Dr. Seman diagnosed rule-out pervasive developmental delay and speech delay. (Tr. 608). Plaintiff saw Dr. Seman again in November 2013. (Tr. 609). Abrams reported Plaintiff did well in class but hit and bit other children on the bus. *Id*. On examination, Plaintiff was alert with a euthymic affect and "bright" speech. *Id*. Dr. Seman prescribed Abilify "for intense irritability". *Id*.

Plaintiff returned to Dr. Seman in January 2014. (Tr. 611-12). Abrams reported Plaintiff was less agitated on Abilify and had less frequent "episodes", but when he did have one, it was still very intense. (Tr. 611). Dr. Seman found Plaintiff alert with "bright speech" and noted that Plaintiff "relate[d] better". *Id*. He continued Plaintiff's diagnosis and increased the Abilify dose. *Id*.

At an individual counseling session in January 2014 with Linda James, Plaintiff's father rated Plaintiff's problem severity as "moderate". (Tr. 643). He reported Plaintiff struggled with his behavior while at Abrams's house and that Abrams often called him so he could talk to Plaintiff about his behavior. *Id*. Plaintiff's father reported that while Plaintiff and his brother were in his care, they behaved well, other than "a little back talk". *Id*. Ms. James found Plaintiff presented with a happy mood. *Id*. In February, Abrams reported Plaintiff acted out at home, hit her and his brother, and refused to sit in a time-out or put his toys away. (Tr. 645). Abrams stated Plaintiff did not have these problems at school or at his father's home. *Id*. Ms. James noted Plaintiff had "a very short attention span" and could not keep his hands to himself during the session. *Id*.

Later in February 2014, Abrams reported Plaintiff was doing well on Abilify. (Tr. 613). Dr. Seman found Plaintiff was alert with a euthymic mood. *Id*.

In April 2014, Plaintiff attended a psychological evaluation with pediatric psychologist David Chiarella, Ph.D. (Tr. 601-05). Abrams, who was present during the evaluation, reported Plaintiff demonstrated "significant behavior problems". (Tr. 601). She noted Plaintiff often yelled and screamed, hit others, was highly emotional, and had a difficult time calming when he was upset. *Id*. She stated Plaintiff was able to dress and bathe himself without assistance, though he sometimes put his shoes on the wrong feet. (Tr. 603). Abrams further reported Plaintiff was "independent" in eating and sleeping. *Id*. Plaintiff reported feeling "happy" most of the time, but sometimes felt "sad and mad". (Tr. 602). He denied any intent to harm himself or others. *Id*. Plaintiff reported he liked preschool and had friends there. (Tr. 603). On examination, Dr. Chiarella observed Plaintiff separated from Abrams without incident. (Tr. 602). Plaintiff was appropriately dressed, had an "expansive" affect, offered spontaneous conversation, and asked questions. *Id*. During the examination, Dr. Chiarella found Plaintiff had a "heightened degree of body activity" and "was unable to remain in his seat" after being asked three times. *Id*. He found Plaintiff had limited concentration and required redirection. *Id*. Dr. Chiarella noted Plaintiff's full-scale IQ score was 104 – which placed his intellectual skills "solidly within the average range". (Tr. 603).

At a counseling appointment with Ms. James in April 2014, Plaintiff's father rated his problem severity as "severe" because he was "demanding", sought attention, and was "bossy" with his brother. (Tr. 647). He reported Plaintiff hits himself in the head when he knows he did something wrong. *Id*. Plaintiff's father encouraged him to make better choices at Abrams's home like he did at school. *Id*.

In a May 2014 visit with Dr. Seman, Abrams noted Plaintiff was still irritable and continued having tantrums. (Tr. 615). She believed the Abilify contributed to an increase in bedwetting incidents. *Id*. Dr. Seman prescribed Risperdal instead. *Id*. In June, Abrams reported Plaintiff was

"doing better" with tantrums but was still defiant. (Tr. 617). Dr. Seman found Plaintiff had an alert, euthymic mood with bright speech. *Id*. He continued Plaintiff on Risperdal. *Id*.

Plaintiff and Abrams attended a counseling session with Ms. James in July 2014. (Tr. 651). Abrams rated Plaintiff's problem severity as "severe". *Id*. On examination, Plaintiff had an apprehensive mood, struggled with listening, was impulsive, interrupted, and clung to Abrams. *Id*. Abrams thought Plaintiff needed regular counseling appointments to address his behavior. *Id*. Plaintiff presented to Dr. Seman with his father later in July. (Tr. 665). Plaintiff's father reported he was doing well, had good moods, a bright affect, slept well, and had no aggression. *Id*. Plaintiff needed to repeat PreK. *Id*. Dr. Seman continued Plaintiff on Risperdal. *Id*.

In August 2014, Plaintiff and his father saw pediatric neurologist David Rothner, M.D. (Tr. 623-25). Plaintiff's father reported speech issues, but that Plaintiff had no behavioral problems at school or home. (Tr. 623). On examination, Plaintiff was alert and oriented with normal cognition and a "busy" affect. (Tr. 624). Dr. Rothner noted Plaintiff's speech was difficult to understand. *Id*. Dr. Rothner did not offer a diagnosis, but noted a "concern re[garding] learning." *Id*.

Plaintiff attended an occupational therapy evaluation at Kids' Choice, LLC in September 2014. (Tr. 753-58). Plaintiff's father expressed concern about Plaintiff's speech, motor skills, frustration tolerance, ability to follow direction, and attention span. (Tr. 753). On examination, providers found Plaintiff demonstrated poor attention to tasks, fidgeted, and threw a tantrum when redirected. (Tr. 754). Providers found Plaintiff only demonstrated "some problems" in the areas of social participation, vision, and planning and ideas. (Tr. 757).

In May 2015, Plaintiff and Abrams met with Dr. Seman. (Tr. 827). Abrams reported Plaintiff was "not doing well", and his current medication was ineffective. *Id*. She noted Plaintiff

needed to repeat PreK. *Id*. Dr. Seman found Plaintiff had an alert affect, was reactive, and had a labile mood that was "up and down". *Id*. Dr. Seman prescribed Ritalin. (Tr. 828).

Ms. James prepared a new intake assessment for Plaintiff in July 2015. (Tr. 805-09). Abrams reported Plaintiff had continued difficulties with his frustration level and impulsiveness, but his behavior improved during the past year. (Tr. 805). On examination, Ms. James found Plaintiff appropriately and neatly dressed. (Tr. 809). He was alert and oriented, and cooperative, with fair eye contact, average mental abilities, and a labile affect. *Id*. He also had poor emotional insight and social judgment, was hyperactive, and had slurred speech. *Id*.

In August 2015, Plaintiff saw psychiatric nurse practitioner Christopher Kalinyak at the Columbiana Center for a medication check. (Tr. 829). Abrams reported Plaintiff was "for the most part [] doing quite well with current medications." *Id*. Mr. Kalinyak found Plaintiff alert and oriented with good speech and appropriate concentration and focus. *Id*. Mr. Kalinyak prescribed Ritalin and Clonidine. *Id*. In November, Abrams reported to Mr. Kalinyak that Plaintiff had problems both at school and at home. (Tr. 831). She further reported Plaintiff had a difficult time with sleeping, "pestering", and was "always whining about something." *Id*. Mr. Kalinyak found Plaintiff alert and oriented, but noted he was "constantly talking [and] not waiting [his] turn", impulsive, and "very needy". *Id*. Plaintiff had a flat affect. *Id*. Mr. Kalinyak added Methylphenidate to Plaintiff's medications. *Id*.

In December 2015, Plaintiff saw Ms. James accompanied by both parents. (Tr. 825). The parents reported struggling with the difference in Plaintiff's behavior between their homes. *Id*. As an example, Abrams reported difficulty getting Plaintiff taking his medication, while Plaintiff's father reported it was not a problem in his home. *Id*. Abrams described her family environment as "high stress" due to her health concerns and moving three times within the school year. *Id*.

7

By January 2016, Plaintiff's father reported Plaintiff was doing much better in school and responding well to his medication. (Tr. 833). Plaintiff's behavior at school and at home improved. *Id*. He did not receive any calls from the school regarding Plaintiff's behavior. *Id*. Mr. Kalinyak noted Plaintiff was "more directable", with good concentration and focus, and no impulsivity. *Id*. In March, Abrams reported Plaintiff had not been on his medication for "a few weeks". (Tr. 1005). She stated Plaintiff was "quite out of control". *Id*. Mr. Kalinyak observed Plaintiff had loud speech, was restless and uncooperative, and had poor concentration and focus. *Id*. Mr. Kalinyak increased Plaintiff's Ritalin dosage. (Tr. 1006). In July 2016, Abrams reported Plaintiff continued to misbehave. (Tr. 1011). She stated Plaintiff began mistreating the household animals. *Id*. She also reported Plaintiff was doing "fairly well" in school. *Id*. Mr. Kalinyak found Plaintiff alert and oriented, redirectable, with some anger issues and oppositional behavior. *Id*. Plaintiff's concentration and focus were good. *Id*.

At a September 2016 follow-up with Dr. Rothner, Plaintiff had clear and coherent speech and a "busy" affect. (Tr. 1028).

At an October 2016 visit with Mr. Kalinyak, Plaintiff's father reported school was going well and Plaintiff's teachers reported his behavior was "acceptable". (Tr. 1036). Abrams thought Plaintiff was a "different person" when in her home. *Id*. Mr. Kalinyak found Plaintiff was alert and oriented; he spoke loudly with a lisp, was directable and had good eye contact, concentration, and focus. *Id*.

Medical Opinion Evidence

*Treating Physicians*

In July 2014, Dr. Seman completed a Medical and Functional Equivalence Questionnaire. (Tr. 619-22). He opined Plaintiff was moderately[1] limited in his health and well-being; his ability to acquire and use information; and care for himself. (Tr. 619, 621). Plaintiff was markedly[2] limited in his ability to attend and complete tasks, and interact with and relate to others. (Tr. 620). Dr. Seman found no evidence of limitation in Plaintiff's ability to move about and manipulate objects. *Id*. Further, Dr. Seman reported Plaintiff had no problems with school attendance or side-effects from medications. (Tr. 621).

In March 2016, Mr. Kalinyak completed a Medical and Functional Equivalence Questionnaire. (Tr. 973-76). He opined Plaintiff had a marked[3] limitation in his ability to acquire and use information, attend and complete tasks, move about and manipulate objects, care for himself, and in his health and well-being. (Tr. 973-75). He found Plaintiff was extremely[4] limited in his ability to interact with and relate to others. (Tr. 974).

In October 2016, Mr. Kalinyak completed a second Medical and Functional Equivalence Questionnaire. (Tr. 1023-26). In it, he opined Plaintiff had an extreme limitation in his ability to acquire and use information, attend and complete tasks, and interact with and relate to others. (Tr.

_____

1. The form does not define "moderately". *See* Tr. 619.

2. The form defines a "marked" limitation as one which "interferes seriously with the child's ability to function independently, appropriately, and effectively in an age appropriate manner." (Tr. 619).

3. The form defines a "marked" limitation the same way Dr. Seman's did. (Tr. 973).

4. The form defines an "extreme" limitation as one where Plaintiff has "no meaningful function in a given area." (Tr. 973).

1023-24). He found Plaintiff markedly limited in his ability to move about and manipulate objects, care for himself, and in his health and well-being. (Tr. 1024-25).

*Examining Physician*

During an April 2014 psychological evaluation, Dr. Chiarella found Plaintiff's "ability to acquire, use and retain general information was adequate given his measured intellectual skills", though it was "likely that his behavior may limit his ability to learn and retain information." (Tr. 604). He opined Plaintiff's ability to "attend and concentrate" was "limited" due to his heightened degree of body activity during the evaluation and hyperactivity, both in the waiting room and in his office. *Id.* In the category of ability to interact and relate to others, Dr. Chiarella did not proffer an opinion, but repeated Abrams reports of Plaintiff's difficulties in maintaining age-appropriate relationships and physical altercations with his brother. *Id.* Similarly, in the area of self-care, Dr. Chiarella did not proffer an opinion, but repeated Abrams reports of Plaintiff's sleeping, eating, and dressing habits. *Id.*

*Reviewing Physicians*

State agency reviewing providers Lisa Lynch, M.A. (speech therapist), Deryck Richardson, Ph.D. (psychologist), and Malika Haque M.D. (pediatrician), collectively provided a medical source opinion in the spring of 2014. (Tr. 68-70). They found Plaintiff had less than marked limitation in all six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. *Id.* In November 2014, State agency reviewing providers Melissa Hall, M.A. (speech therapist), Tonnie Hoyle, Psy.D. (psychologist), and Anahi Ortiz, M.D. (pediatrician), collectively provided a medical source opinion. (Tr. 82-85). They also opined Plaintiff had less than marked limitation in all six domains. *Id.*

10

Educational Records and IEP

In November 2013, Plaintiff underwent an evaluation with the Columbiana County Educational Services Center. (Tr. 214-37). Providers completed an initial Evaluation Team Report ("ETR"). *Id*. Plaintiff achieved an age equivalent score of two years and three months on the Goldman-Fristoe Test of Articulation (Tr. 220), and failed three out of four parts of the Fluharty Preschool Speech and Language Screening Test (Tr. 221). Providers recommended speech and language therapy services. *Id*. A psychologist found Plaintiff could feed himself without assistance, toileted appropriately during the day and night, put on front-opening clothes without assistance, and brushed his teeth without assistance. (Tr. 229). Plaintiff had difficulty with buttons and snaps. *Id*. The psychologist found Plaintiff difficult to understand and "somewhat impulsive" in answering questions. (Tr. 230). Plaintiff demonstrated friendship-seeking behaviors with his peers and showed interest in the activities of other children. (Tr. 231).

An Individualized Education Program ("IEP") was also completed in November 2013 by the Columbiana County Educational Services Center. (Tr. 238-56). Plaintiff displayed poor sitting behavior, had difficulty attending to tasks when no visual supports were provided, and his sentences were "spontaneous" and inferior to that of his peers. (Tr. 251). Providers recommended speech and language therapy. (Tr. 253).

A school speech therapist completed a questionnaire in March 2014. (Tr. 281-82). The therapist[5] saw Plaintiff once per week for thirty minutes. (Tr. 281). Plaintiff's conversational speech was "difficult to understand at times." *Id*. His intelligibility rating – known context in conversation – was 75%; his unknown context was 60%. *Id*. The therapist noted that "[w]ith continued treatment, [Plaintiff's] prognosis for communication skill development is good." *Id*. The

_____

5. The speech therapist's signature is illegible. *See* Tr. 282.

therapist expressed concern that Plaintiff's speech difficulties caused frustration, and that he might withdraw from socialization if they continue. (Tr. 282).

In March 2014, Sarah McDevitt (Plaintiff's preschool teacher) completed a teacher questionnaire. (Tr. 548-54). In the area of interacting and relating with others, she found Plaintiff had a "slight problem" using proper vocabulary to ask permission. (Tr. 551). She found Plaintiff had "an obvious problem" with seeking attention, using proper language to relate experiences and tell stories, and maintaining relevant and appropriate topics of conversation. *Id*. He had "a serious problem" interrupting in conversations, and a "very serious problem" using adequate vocabulary and grammar to express himself. *Id*. She noted: "speech is intelligible to most, limited vocabulary, talks fast too". *Id*. As a familiar listener, Ms. McDevitt estimated she could understand half of Plaintiff's speech. *Id*.

In February 2016, Stephen Fowler, Plaintiff's kindergarten teacher, completed a school activities questionnaire. (Tr. 383-84). Mr. Fowler found Plaintiff's abilities to follow instruction, work independently, understand and complete assignments, and respond to changes in routine, as well as attention and concentration, were "below average". (Tr. 383). Plaintiff's ability to respond to criticism and progress in skills involved in reading, writing, and mathematics were "average". *Id*. Mr. Fowler noted Plaintiff talked excessively, was very active in class, and did not follow directions. (Tr. 384). Plaintiff had trouble socializing with his peers and had difficulty buttoning his coat/pants. *Id*. Mr. Fowler also Plaintiff's parents did not attend parent/teacher conferences, and he had difficulty meeting with them. *Id*.

In March 2016, Marsha Hodgson of the Columbiana County Mental Health Clinic met with Plaintiff and his teacher at school. (Tr. 1004). The teacher reported Plaintiff had trouble with personal space, talked in class, and had trouble getting his folder back and forth between home

and school. *Id*. However, the teacher did think Plaintiff made some progress since he transferred to the school four months prior. *Id*.

An IEP was completed in March 2016. (Tr. 399-412). Teachers described Plaintiff as a "sweet boy who is very talkative with peers an[d] adults." (Tr. 400). Plaintiff had difficulty with remaining in his seat or designated area for a task. *Id*. He "rushed" through his work, and often interrupted his peers or adults; he spoke loudly to get their attention. *Id*. Speech therapy providers noted Plaintiff was "making significant progress in the area of expressive/receptive language." (Tr. 403). He was "able to produce simple appropriate sentences and use auxiliary verbs with independence." *Id*.

In April 2016, Plaintiff's teacher reported improvement in Plaintiff's classroom behavior to Ms. Hodgson. (Tr. 1012). The teacher noted Plaintiff had very poor impulse control when he ran out of medication, but his behavior improved in the afternoon after taking his medication. *Id*.

ALJ Decision

In a written decision, the ALJ found Plaintiff was born in June 2009, making him a preschool-aged child on the date of application and a school-aged child at the time of the decision. (Tr. 13). Plaintiff had not engaged in any substantial gainful activity since his application date. *Id*. The ALJ found Plaintiff had severe impairments of attention deficit hyperactivity disorder (ADHD); phonological disorder/speech and language impairment; and oppositional defiant disorder. *Id*. The ALJ found none of these impairments met or medically equaled the severity of one of the listed impairments. (Tr. 14). Further, the ALJ found that Plaintiff did not have an impairment or combination of impairments that functionally equaled the severity of the listings. (Tr. 15).

The ALJ found Plaintiff had less than marked limitation in the domains of: acquiring and using information, interacting and relating with others, moving about and manipulating objects, ability to care for oneself, and health and physical well-being; he had marked limitation in the domain of attending and completing tasks. *See* Tr. 18-24. Thus, the ALJ concluded, Plaintiff was not disabled from the date of his application through the date of the decision. (Tr. 24).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

STANDARD FOR DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

14

months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). For claimants under the age of 18, the Commissioner follows a three-step evaluation process—found at 20 C.F.R. § 416.924(a)—to determine if a claimant is disabled:

1.   Is claimant engaged in a substantial gainful activity? If so, the claimant is not disabled regardless of their medical condition. If not, the analysis proceeds.

2.   Does claimant have a medically determinable, severe impairment, or a combination of impairments that is severe? For an individual under the age of 18, an impairment is not severe if it causes a slight abnormality or a combination of slight abnormalities which causes no more than minimal functional limitations. If there is no such impairment, the claimant is not disabled. If there is, the analysis proceeds.

3.   Does the severe impairment meet, medically equal, or functionally equal the criteria of one of the listed impairments? If so, the claimant is disabled. If not, the claimant is not disabled.

To determine whether an impairment or combination of impairments functionally equals a listed impairment, the minor claimant's functioning is assessed in six different functional domains. 20 C.F.R. § 416.926a(b)(1). If the impairment results in "marked" limitation in two domains of functioning, or an "extreme" limitation in one domain of functioning, then the impairment is of listing-level severity and therefore functionally equal to the listings. *Id.* § 416.926a(a).

A "marked" limitation is one that is more than moderate but less than extreme, and interferes "seriously" with the ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(2)(i). "It is the equivalent of functioning [one] would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. *Id*. An "extreme" limitation is one that interferes "very seriously" with the ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(3)(i). The six functionality domains are: 1) acquiring and using information, 2) attending and completing tasks, 3) interacting and relating with others, 4) moving about and manipulating objects, 5) caring for yourself, and 6) health and

physical well-being. *Id.* § 416.926a(b)(1). In determining functional equivalence, the ALJ must consider the "whole child." Social Security Ruling ("SSR") 09–lp, 2009 WL 396031, at *2.

**DISCUSSION**

As described above, the Commissioner must find functional equivalence if the impairment results in "marked" limitation in two domains of functioning, or an "extreme" limitation in one domain of functioning. 20 C.F.R. § 416.926a(a). Here, Abrams argues that the evidence of record supports a marked level of functioning in the domains of: (1) interacting and relating with others; and (2) caring for self.[6] The Commissioner responds that the ALJ's decision is supported by substantial evidence. For the reasons discussed below, the undersigned recommends the decision of the Commissioner be affirmed**.**

Functionality Domains

*Interacting and Relating with Others*

First, Abrams argues the ALJ should have found Plaintiff to have marked, rather than less than marked, limitation in interacting and relating with others. Specifically, she argues that medical and educational evidence demonstrates Plaintiff struggled with communication and social frustration, and these difficulties demonstrate marked limitation in this domain. (Doc. 12, at 15). The Commissioner responds that the ALJ's determination regarding this domain is supported by substantial evidence.

The domain of interacting and relating with others considers "how well you initiate and sustain emotional connections with others, develop and use the language of your community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the

---

6. Because the ALJ found marked limitation in Plaintiff's ability to attend and complete tasks (Tr. 20), the ALJ need only find marked limitation in one of these domains for Plaintiff to be considered functionally disabled. *See* 20 C.F.R. § 416.926a(a).

possessions of others." 20 C.F.R. § 416.926a(i). The regulations define the expectations in this

domain for preschool-age children (age 3-6) as follows:

> At this age, you should be able to socialize with children as well as adults. You
> should begin to prefer playmates your own age and start to develop friendships with
> children who are your age. You should be able to use words instead of actions to
> express yourself, and also be better able to share, show affection, and offer to help.
> You should be able to relate to caregivers with increasing independence, choose
> your own friends, and play cooperatively with other children, one-at-a-time or in a
> group, without continual adult supervision. You should be able to initiate and
> participate in conversations, using increasingly complex vocabulary and grammar,
> and speaking clearly enough that both familiar and unfamiliar listeners can
> understand what you say most of the time.

20 C.F.R. § 416.926a(i)(2)(iii). For school-aged children (age 6-12), the expectations change:

> When you enter school, you should be able to develop more lasting friendships with
> children who are your age. You should begin to understand how to work in groups
> to create projects and solve problems. You should have an increasing ability to
> understand another's point of view and to tolerate differences. You should be well
> able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner
> that both familiar and unfamiliar listeners readily understand.

20 C.F.R. § 416.926a(i)(2)(iv).

Examples of limited functioning in this domain (although such examples do not necessarily

indicate a marked or extreme limitation) include: 1) not reaching out to be picked up and held; 2)

having no close friends, or friends are all older or younger; 3) avoiding or withdrawing from people

the child knows, or the child is overly anxious or fearful of meeting new people or trying new

things; 4) having difficulty with playing games or sports with rules; 5) having difficulty

communicating with others; and 6) having difficulty speaking intelligibly or with adequate

fluency. 20 C.F.R. § 416.926(a)(i)(3)(i)-(vi); *see also* SSR 09-5p, 2009 WL 396026, at *6-7.

The ALJ explained his finding of less than marked limitation in this domain:

> The claimant does have a speech and language impairment that has resulted in
> frustration with communication and his mother has reported that he has some
> difficulty with his peers (Exhibits 2E and 8E). However, this appears to be
> improving with therapy. The claimant's kindergarten teacher reported that the

claimant had trouble socializing with peers (Exhibit 17E). However, the claimant testified that he now has friends, and his IEP indicates that he was demonstrating friendship seeking with his peers (Exhibit 11E/49). Further, while he is diagnosed with attention deficit hyperactivity disorder and oppositional defiant disorder, he has not been suspended from school for inappropriate behavior. Additionally, although his mother has reported tantrums and aggressive behavior toward his brother, such behavior is not reflected in school reports and appears to be more in the home setting. The undersigned finds that these facts support a less than marked limitation in this domain.

(Tr. 21).

Here, the ALJ reasonably relied on several pieces of evidence in arriving at his determination. First, he recognized Plaintiff had a speech and language impairment which, at times, frustrated his communication, however, evidence suggests the impairment improved with therapy. (Tr. 21). For example, earlier in his decision, the ALJ noted that Dr. Chiarella found Plaintiff's speech intelligible 75 to 80 percent of the time at the 2014 consultative examination. (Tr. 13) (citing Tr. 602). The ALJ further noted Plaintiff's speech continued to improve over time as evidenced by Dr. Rothner's September 2016 observation that Plaintiff's speech was clear and coherent. (Tr.13) (citing Tr. 1028). The ALJ also found improvement in Plaintiff's relationships with, and ability to relate to, his peers. (Tr. 21). As evidence, the ALJ pointed to Plaintiff's testimony that he has friends (Tr. 46), and his 2013 ETR report reflected Plaintiff "show[ed] interest in the activities of other children" and "demonstrate[ed] friendship seeking with peers" (Tr. 354). Plaintiff cites a 2015 IEP as evidence of a marked limitation in this domain, arguing that it showed Plaintiff, at times, needed prompting and modeling so as not to interrupt, and needed extra time to process and express his thoughts. (Doc. 12, at 15) (citing Tr. 863). However, on that very same page, the evaluator noted Plaintiff's language skills were "developing", and he "was a pleasant student who demonstrates a nice interest in working with adult educators and interacting with his peers." (Tr. 863). The ALJ did not err in considering such improvements in Plaintiff's

18

speech or peer relationships when arriving at his decision. *See Deloach v. Comm'r of Soc. Sec.,* 2014 WL 533591, at *14 (S.D. Ohio) (finding a claim of functional disability undermined by improvement demonstrated in treatment notes).

The ALJ also recognized that, "although his mother has reported tantrums and aggressive behavior toward his brother, such behavior is not reflected in school reports and appears to be more in the home setting". (Tr. 21). This finding is supported by substantial evidence. For example, at a 2014 appointment with Dr. Rothner, Plaintiff's father reported no behavioral problems in his home or at school. (Tr. 623). Similarly, at two 2014 appointments with Ms. James, Abrams reported Plaintiff struggled with his behavior in her home but had no problems at his father's home or at school. (Tr. 645, 647). Abrams reported similar behavioral patterns to Ms. James again in December 2015. (Tr. 825). In October 2016, Mr. Kalinyak reported teachers found Plaintiff's behavior "acceptable" at school, and Abrams thought Plaintiff "was a different person" while in her home. (Tr. 1036).

Plaintiff also (very generally) argues that evidence supports Dr. Seman and Mr. Kalinyak's opinions Plaintiff was markedly limited in this domain. (Doc. 12, at 17). However, the ALJ assigned Dr. Seman's opinion in this domain "little weight" because it was not consistent with Plaintiff's testimony that he has friends, the IEP reports which demonstrated friendship seeking behavior with peers, and the lack of school reports of inappropriate behavior towards others. (Tr. 17). As detailed above, the ALJ thoroughly considered this evidence and found it inconsistent with a marked level of impairment. Thus, his conclusion regarding Dr. Seman's opinion of Plaintiff's ability to interact with others is supported by the same substantial evidence cited above. The ALJ also addressed the opinion of Mr. Kalinyak and – for the same reasons – rejected his opinion that Plaintiff was extremely limited in his ability to interact with others. *Id*.

Although Plaintiff points to evidence with which the ALJ could have reached a different conclusion in this domain, the Court must ultimately determine whether the ALJ's conclusion is supported by substantial evidence. The substantial evidence standard creates a "zone of choice within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (quotation omitted). The undersigned therefore concludes the ALJ did not err in his evaluation of this domain, and his decision falls with the "zone of choice" allowed by the substantial evidence standard.

*Caring for Self*

Next, Abrams contends the ALJ erred in finding Plaintiff had a less than marked limitation in the domain of caring for oneself. Specifically, she argues a marked limitation is supported by specific pieces of medical and educational evidence of Plaintiff's low frustration tolerance, decreased self-control, and tantrums. The Commissioner responds that the ALJ's determination in this domain is supported by substantial evidence.

The "caring for yourself" domain includes "how well you maintain a healthy emotional and physical state, including how well you get your physical and emotional wants and needs met in appropriate ways; how you cope with stress and changes in your environment; and whether you take care of your own health, possessions, and living area." 20 C.F.R. § 416.926a(k); *see also* SSR 09-7p, 2009 WL 396029. The regulation provides, regarding preschool-aged children (age 3 to 6):

> You should want to take care of many of your physical needs by yourself (e.g., putting on your shoes, getting a snack), and also want to try doing some things that you cannot do fully (e.g., tying your shoes, climbing on a chair to reach something up high, taking a bath). Early in this age range, it may be easy for you to agree to do what your caregiver asks. Later, that may be difficult for you because you want to do things your way or not at all. These changes usually mean that you are more confident about your ideas and what you are able to do. You should also begin to understand how to control behaviors that are not good for you (e.g., crossing the street without an adult).

20 C.F.R. § 416.926a(k)(2)(iii). The SSR expands on what constitutes typical functioning in this domain for a preschool-aged child, including: "tries to do things that he is not fully able to do"; "agrees easily and early in this age range to do what caregiver wants, but gradually wants to do many things [his] own way or not at all"; "develops more confidence in abilities"; and "begins to understand how to control behaviors that are potentially dangerous (for example, crossing street without an adult." SSR 09-7p, 2009 WL 396029, at*5.

> For school-age children (age 6 to 12):
>
> You should be independent in most day-to-day activities (e.g., dressing yourself, bathing yourself), although you may still need to be reminded sometimes to do these routinely. You should begin to recognize that you are competent in doing some activities and that you have difficulty with others. You should be able to identify those circumstances when you feel good about yourself and when you feel bad. You should begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior. You should begin to demonstrate consistent control over your behavior, and you should be able to avoid behaviors that are unsafe or otherwise not good for you. You should begin to imitate more of the behavior of adults you know.

20 C.F.R. § 416.926a(k)(2)(iv). Again, the SSR expands on what constitutes typical functioning in this domain for a school-aged child, including: "recognizes circumstances that lead to feeling good and bad about himself"; "develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior"; "demonstrates consistent control over own behavior and avoids behaviors that are unsafe"; and "performs most daily activities independently (for example dressing, bathing), but may need to be reminded." SSR 09-7p, 2009 WL 396029, at *5.

> The SSR also discusses expressing emotional wants and needs. It explains:
>
> Children must learn to recognize and respond appropriately to their feelings in ways that meet their emotional wants and needs; for example, seeking comfort when sad, expressing enthusiasm and joy when glad, and showing anger safely when upset. To be successful as they mature, children must also be able to cope with negative feelings and express positive feelings appropriately. In addition, after experiencing any emotion, children must be able to return to a state of emotional equilibrium. The ability to experience, use, and express emotion is often referred to as self-

regulation. Children should demonstrate an increased capacity to self-regulate as they develop.

*Id.* at *3.

Examples of limited function in caring for yourself (although such examples do not necessarily show marked or extreme limitation) include: 1) putting inedible objects in the mouth; 2) using self-soothing activities that show developmental regression (e.g., thumbsucking, re-chewing food) or have stereotyped mannerisms (e.g., body rocking, headbanging); 3) not dressing or bathing self appropriately for age; 4) engaging in self-injurious behavior (e.g. self-inflicted injury or refusal to take medication), or ignoring safety rules; 5) not spontaneously pursuing enjoyable activities or interests; or 6) disturbance in eating or sleeping patterns. 20 C.F.R. § 416.926a(k)(3)(i)-(vi). As examples of children whose impairments affect the ability to regulate their emotional well-being, the SSR provides two examples: 1) "A child with an anxiety disorder may use denial or escape rather than problem-solving skills to deal with a stressful situation"; and 2) "A child with attention-deficit/hyperactivity disorder who has difficulty completing assignments may express frustration by destroying school materials." SSR 09-7p, 2009 WL 396029, at *3.

The ALJ here explained his finding of less than marked limitation in this domain:

Although the claimant's kindergarten teacher reported that he was significantly below average in buttoning his coat and pants, he is able to feed, dress, and toilet himself appropriately, but he needs help with bathing (Exhibits 22E/9 and 22E/39). Also, he does have some sleep difficulties and his mother testified that he is prescribed medication, but there is no indication that he is overly fatigued at school. Additionally, the record does not show any self-soothing or self-injurious behaviors. Overall, the undersigned finds that the evidence supports a less than marked limitation in this domain.

(Tr. 23).

22

The ALJ's finding is supported by substantial evidence. First, the ALJ recognized, and Plaintiff points to, some challenges in this domain such as difficulty in buttoning his coat and pants, and difficulty falling asleep. (Tr. 23). However, the ALJ found this does not rise to the level of marked limitation. *Id*. In support of his finding, the ALJ first noted Plaintiff was able to feed, dress, and toilet himself appropriately. *Id*. (citing Tr. 266 (2014 function report, completed by Abrams, showing Plaintiff was able to control his bowels and bladder, feed himself, and dress himself); Tr. 229 (2013 ETR report finding Plaintiff could feed himself, was toilet trained, could put on clothes that opened in the front by himself, and brush his teeth without assistance.)). Turning to Plaintiff's sleep difficulties, the ALJ reasonably found the record did not indicate Plaintiff was overly fatigued at school. (Tr. 23). As evidence to support a marked limitation, Plaintiff points to Abram's testimony that he climbed into bed with her when he had nightmares. (Doc. 12, at 18) (citing Tr. 51). When he did, Abrams testified she would not wake up, but would find Plaintiff asleep in bed with her when the alarm went off. (Tr. 51). Moreover, Plaintiff himself testified he did not have trouble falling asleep. (Tr. 46).

Further, the ALJ noted a lack of self-soothing and self-injurious behavior in the record. (Tr. 23). Indeed, as the ALJ pointed out, nothing in the record shows Plaintiff engaged in self-soothing behaviors as defined under the regulations: "activities showing developmental regression (e.g., thumbsucking, re-chewing food), or . . . restrictive or stereotyped mannerisms (e.g., body rocking, headbanging)". 20 C.F.R. § 416.926a(k)(3)(ii). As evidence to support a marked limitation, Plaintiff cites several instances where Abrams reported Plaintiff hit himself. (Doc. 12, at 18). However, it does not appear that this behavior rose to the level of "self-injurious behavior" contemplated by the regulations. 20 C.F.R. § 416.926a(k)(3)(iv) (listing examples of "self-injurious behavior" as "e.g., suicidal thoughts or actions, self-inflicted injury, or refusal to take . .

. medication")[7].  As further evidence to support less than marked limitation, the ALJ pointed out

that Abrams and Plaintiff's father regularly described Plaintiff's behavior problems as "moderate".

(Tr. 13) (citing Tr. 607, 609, 649, 653, 657). These reasons provide substantial evidence to support

the ALJ's conclusion that Plaintiff had less than marked limitation in this domain.

There is also evidence to support Plaintiff's argument in the record, but the Court sits to

determine whether there is substantial evidence, "more than a scintilla of evidence but less than a

preponderance" such that "a reasonable mind might accept [it] as adequate to support a

conclusion." *Besaw*, 966 F.2d at 1030. The undersigned finds the ALJ's analysis satisfies this

standard and his decision is supported by substantial evidence.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the

undersigned finds the Commissioner's decision denying SSI supported by substantial evidence

and recommends the decision of the Commissioner be affirmed**.**

 s/ James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court

within fourteen days of service of this notice. Failure to file objections within the specified time

---

7. While courts in this district have not specifically addressed whether such action constitutes a "self-inflicted injury", the term has been contemplated before and Plaintiff's actions here are much less serious. *See Boran v. Astrue*, 2011 WL 6122953, at *14 (N.D. Ohio), *report and recommendation adopted*, 2011 WL 6122948 (suicidal thoughts and attempts constituted "self-inflicted injury"); *see also Peshek v. Colvin*, 2014 WL 5684386, at *2 (N.D. Ohio) (throwing self on the floor, hitting head against a wall, punching and biting oneself to the point of leaving bruises and scars constituted "self-inflicted injury").

WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).